UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC OGILVIE,

      Petitioner,

vs.

LORI GIDLEY (Warden),

      Respondent.

---

**PETITION FOR WRIT OF HABEAS CORPUS**

Eric Ogilvie, by his attorney, Jennifer J. Qonja, petitions this Court for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, for the following reasons:

**I.     PARTIES AND JURISDICTION**

1.     Petitioner, Eric Ogilvie, is currently under the jurisdiction of the Michigan Department of Corrections, on parole and residing in Alpena County; Lori Gidley is the warden of Central Michigan Correctional Facility, the facility from which Mr. Ogilvie was paroled.

2.     On February 11, 2010, petitioner, Eric Ogilvie, was convicted in the Wayne County Circuit Court of one count of assault with a dangerous Weapon (felonious assault), in violation of Mich. Comp. Laws § 750.82, and one count of possession of a felony firearm during the commission of a felony, in violation of Mich. Comp. Laws § 750.227b.

3.     Mr. Ogilvie was sentenced on April 16, 2011, to a mandatory 2 years imprisonment on the count of Felony Firearm and 3 years probation on the count of felonious assault.  Mr. Ogilvie was granted an appeal bond on December 6, 2010, and released from prison

1

on bond and remained on probation. Mr. Ogilvie was accused and convicted of a probation violation, his appeal bond was revoked and he was re-sentenced on April 29, 2011, to 1 to 4 years in prison for the felonious assault conviction, consecutive to his 2-year prison term for felony firearm.

4.      This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 2254 and 2241.  Venue in the Eastern District of Michigan is proper pursuant to 28 U.S.C. § 2241 because this matter concerns a criminal case tried in Wayne County, Michigan, in the Eastern District of Michigan.

## II.      HISTORY OF STATE COURT PROCEEDINGS

5.      The charges against the petitioner arose from a dispute with his neighbor, who angrily and aggressively confronted petitioner while he was caring for his lawn with his 3-year-old son; when the neighbor appeared to be pulling a gun, the petitioner pulled a gun he was lawfully carrying to repel the petitioner.  No shots were fired.

6.      The petitioner was tried by jury in the Wayne County Circuit Court in February of 2010, convicted of felonious assault and felony firearm, and sentenced on April 16, 2010, and resentenced on April, 29, 2011; he has been in custody since April of 2011.

7.      Petitioner sought review of his convictions and sentences in the Michigan Court of Appeals by filing a timely claim of appeal on May 26, 2010, after his first sentencing proceedings.  After filing the claim of appeal, post-conviction motions were timely filed in the Wayne County Circuit Court, and denied on December 16, 2011.

8.      Before briefs were prepared and filed in the Court of Appeals, Mr. Ogilvie's appointed appellate counsel moved to withdraw as appellate counsel on January 23, 2012. The trial court granted the motion, and on February 10, 2012, the Chief Judge of the Wayne County

2

Criminal Division, Honorable Timothy M. Kenny, sent a letter to Mr. Ogilvie promising new appellate counsel. (See exhibit C attached to Brief in Support)

9.     Despite persistent letters and telephone calls from Ogilvie and his family to seek new appointed appellate counsel, new appellate counsel was never appointed.

10.     Since Mr. Ogilvie was denied appointment of appellate counsel, he was forced to actively pursue his appeal of right in propria persona, and raised the following issues in the brief he filed himself his direct appeal:

    I.    DEFENDANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL BEFORE AND DURING TRIAL WHERE COUNSEL (1) FAILED TO OBTAIN 911 TAPES AND TRANSCRIPTS, AND (2) FAILED TO REQUEST APPROPRIATE JURY INSTRUCTIONS.

    II.    DEFENDANT WAS DENIED A FAIR TRIAL BY PROSECUTORIAL MISCONDUCT, WHERE THE PROSECUTOR IN CLOSING AND REBUTTAL ARGUMENTS MISSTATED MICHIGAN LAW BY IMPROPERLY STATING THAT THE DEFENDANT USED DEADLY FORCE AND HAD A DUTY TO RETREAT.

    III.    DEFENDANT WAS DENIED A FAIR TRIAL BY ERRONEOUS AND INCOMPLETE JURY INSTRUCTIONS.

    IV.    MATERIAL INFORMATION AND EVIDENCE WAS SUPPRESSED BY THE PROSECUTION FROM THE DEFENDANT PRIOR TO TRIAL WHICH WOULD HAVE BEEN HELPFUL TO THE DEFENDANT.

11.     On May 23, 2013, the Court of Appeals, in *People v. Ogilvie,* Docket No. 298302 and 307897, affirmed his convictions and sentences. The Court of Appeals subsequently denied Mr. Ogilvie's in propria persona motion for reconsideration on July 11, 2013.

12.     The petitioner filed a timely application for leave to appeal in propria persona in the Michigan Supreme Court. On November 25, 2013, in *People v. Ogilvie,* Docket No. 147671 and 147673, the Supreme Court denied leave to appeal.

13.     On March 12, 2014, petitioner sent a letter in propria persona to the Wayne County Circuit Court raising many issues, including "Reissuance of judgment and appointment

3

of appellate counsel since appellate counsel was effectively denied, but expected given the letter from the circuit court."  (See exhibit E attached to Brief in Support)

14.    The trial court treated the letter as a motion for relief from judgment, pursuant to Mich. Court R. 6.500 et seq., and on June 10, 2014, the trial court granted petitioner's request for appointment of appellate counsel, and denied the motion as to all other claims.  (See opinion of trial court attached to Brief as exhibit F)

15.    Petitioner was appointed appellate counsel on June 16, 2014, and the petitioner subsequently filed a motion to reissue the judgment in the Wayne County Circuit Court on June 30, 2014, so a second appeal would be taken with counsel.  On September 18, 2014, the trial court granted the motion to reissue the judgment, finding that petitioner's ability to perfect his appeal of right, with the aid of counsel, was affected, and that petitioner could proceed with his direct appeal of right. Both judgments were reissued on October 10, 2014.

16.    Petitioner timely filed claims of appeal in the Michigan Court of Appeals on both of the reissued judgments on October 28, 2014, in an effort to pursue an appeal with counsel.

17.    On November 6, 2014, the Court of Appeals, in *People v. Ogilvie,* Docket No. 324327 and 324328, dismissed the claims of appeal for lack of jurisdiction, finding the reissuance of the judgments of sentences were "not a final order as defined in MCR 7.202(6). MCR 7 .203(A)(I)."  On January 16, 2015, the Court of Appeals denied petitioner's motions for reconsideration.

18.    The petitioner filed timely applications for leave to appeal in the Michigan Supreme Court.  On September 9, 2015, in *People v Ogilvie,* Docket No. 151212 and 151214, the Michigan Supreme Court denied leave to appeal.

4

### III.   GROUNDS FOR RELIEF

19.     The petitioner is entitled to federal habeas corpus relief because his convictions and sentences rest on a trial that violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

20. The federal rights of the petitioner that were violated, and whose violation the state courts have ignored or excused, are the following:

A. Petitioner was denied his right to assistance of counsel in his direct appeal of right in violation of his rights under the Sixth Amendment of the United States Constitution, where petitioner was promised appellate counsel, and despite several requests for counsel, counsel was never appointed, and petitioner was forced to proceed with his direct appeal of right in pro per.

B. The state courts failed to cure the denial of counsel on appeal by denying the petitioner a second appeal after counsel was appointed.

C. At his trial, the court instructed the jury on self-defense with an element of deadly force and on the petitioner's duty to retreat, where there was no use of deadly force by the petitioner and no duty to retreat, these erroneous jury instructions went to the heart of the case before the jury and violated the petitioner's right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

D. The prosecutor committed misconduct, denying the petitioner his right to a fair trial and due process of the laws, under the Fifth, Sixth, and Fourteenth Amendments, when (1) during closing and rebuttal arguments, the prosecutor made misstatements of the Michigan's self-defense law, mischaracterized evidence of petitioner pointing a gun as deadly force, and wrongfully suggested that the petitioner had a duty to retreat,

when in fact, under Michigan law, pointing a gun is not deadly force, and petitioner had no duty to retreat, and (2) failed to provide the defense with exculpatory and admissible evidence that contradicted witness testimony—the 911 calls made by petitioner's wife and a neighbor—which was crucial to the petitioner's valid claim of self-defense, as both 911 callers communicated their belief that the petitioner's neighbor was going for a gun.

E. The petitioner, who was not guilty of the felonies he was charged with due to a valid claim of self-defense, received ineffective assistance of trial counsel, in violation of his rights under the Sixth Amendment of the United States Constitution, where his trial counsel committed serious and prejudicial errors in his representation of the petitioner, errors that a competent criminal defense attorney would not have made, and errors which prejudiced the petitioner and resulted in a trial whose verdict was not reliable. In particular, Petitioner's trial counsel (1) failed to investigate and obtain 911 call recordings containing admissible statements that contradicted the complainant's testimony and were fundamental to petitioner's self-defense theory, and (2) failed to request the appropriate jury instructions where the jury erroneously was instructed that petitioner used deadly force even though, under Michigan law, deadly force was not used, and where the jury was erroneously instructed that the petitioner had a duty to retreat.

F. The petitioner received ineffective assistance of appellate counsel, in violation of his rights under the Sixth Amendment of the United States Constitution, where appellate counsel failed to a raise a meritorious appellate issue in petitioner's trial court post-

conviction motions of prosecutorial misconduct in violation of *Brady v. Maryland*—the withholding of one of the 911 recordings.

21. The petitioner has exhausted all of the constitutional claims presented above by presenting them to the state courts either in a direct appeal, in a collateral attack on his conviction, as permitted by Mich. Court R. 6.500 et seq., or in a second appeal with counsel.

22. The decisions of the state courts denying relief to the petitioner on the grounds stated in this petition were contrary to, and involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). The state court decisions were also based on unreasonable determinations of the facts. 28 U.S.C. § 2254(d)(2).

23. Petitioner reserves the right to amend this petition to more definitely and more particularly plead the grounds for the claims made in this petition, consistent with the Federal Rules of Civil Procedure, and his rights under 28 U.S.C. § 2254. This petition is based on the brief in support of this petition filed contemporaneously, and on the record of proceedings in the state court.

## RELIEF REQUESTED

Petitioner, Eric Ogilvie, moves this court to grant the following relief:

A.      Accept jurisdiction over this case;

B.      Require respondent to appear and answer the allegations in this petition;

C.      Conduct a hearing at which proof may be offered to support the allegations of this petition;

D.      Allow petitioner to file such briefs and exhibits as this court may require on the questions raised by this petition;

E.      Permit discovery by the petitioner, in accordance with Rule 6 of the Rules for Section 2254 Cases;

F.      Issue a Writ of Habeas Corpus to have the petitioner brought before it and order his release from unconstitutional confinement and restraint;

G.      Order the petitioner's release on bond; and

H.      Grant such other further and different relief as the court may deem just and proper under the circumstances.

Respectfully submitted,

Dated: March 18, 2016                            /s/  Jennifer J. Qonja_____
                                                 Jennifer J. Qonja (P79156)
                                                 Frank D. Eaman (P13070)
                                                 Attorneys for Petitioner
                                                 Frank D. Eaman PLLC
                                                 645 Griswold St., Suite 3060
                                                 Detroit MI 48226
                                                 (313) 962-7210

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC OGILVIE,

      Petitioner,

vs.

LORI GIDLEY (Warden),

      Respondent.

---

**BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

**TABLE OF CONTENTS**

STATEMENT OF FACTS     11

1. *Trial and Sentencing Proceedings*     11
2. *The 911 Calls That Were Never Heard by the Jury.*     16
3. *Post-Conviction Motions for New Trial and Evidentiary Hearing.*     17
4. *The Trial Court's Promise of Substitute Appellate Counsel on Direct Appeal, Ogilvie's Continued Request for Appointment of Appellate Counsel, and the State Court's Failure to Appoint Counsel for Appeal.*     21
5. *The Court of Appeals Decision in Ogilvie's in Pro Per Appeal.*     22
6. *Motion for Relief from Judgment in State Trial Court.*     24
7. *Reissuance of Judgments of Sentences and Appointment of Appellate Counsel so that Ogilvie Can Proceed with a Second Appeal with Counsel.*     25
8. *State Court's Denial of Ogilvie's Appeal of Right With New Appointed Appellate Counsel.*     25

ARGUMENT     27

*Standard of Review*     27

I.     This petition for habeas corpus is timely filed.     27

II.     Petitioner was denied his right to assistance of counsel in his direct appeal of right in violation of his rights under the Sixth Amendment of the United States Constitution.     31

III.   Instructing the jury on self-defense with the element of deadly force and instructing on the petitioner's duty to retreat were erroneous instructions that went to the heart of the case before the jury and violated the petitioner's right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.                34

IV.   The petitioner was denied his right to a fair trial, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because of the pervasive misconduct of the prosecutor (1) in arguing that Ogilvie used deadly force and had a duty to retreat, when no deadly force was used by Ogilvie and he had no duty to retreat, and (2) in failing to produce exculpatory evidence.                39

    A. During closing and rebuttal arguments, the prosecutor made misstatements of Michigan's self-defense law, mischaracterized evidence of petitioner pointing a gun as deadly force, and wrongfully suggested that the petitioner had a duty to retreat, when in fact, under Michigan law, pointing a gun is not deadly force, and petitioner had no duty to retreat.                40

    B. The prosecution failed to provide the defense with the exculpatory and admissible evidence of the 911 calls to the police, which contradicted witness testimony, and was crucial to the petitioner's valid claim of self-defense because both callers believed the neighbor who attacked Ogilvie had a gun.                42

V.   The petitioner received ineffective assistance of trial and appellate counsel, in violation of his rights under the Sixth Amendment of the United States Constitution.                44

    A. Trial counsel failed to investigate and obtain 911 calls and transcripts containing admissible statements that contradicted the complainant's testimony and were fundamental to petitioner's self-defense theory.                45

    B. Trial counsel failed to request the appropriate jury instructions where the jury was instructed that petitioner used deadly force even though, under Michigan law, deadly force was not used, and the petitioner was entitled to an instruction on the element of non-deadly force as a component of self-defense.                47

    C. In petitioner's post-conviction motions in state trial court, appellate counsel failed to raise the meritorious appellate issue of prosecutorial misconduct for failing to disclose evidence of Amy Ogilvie's 911 calls in violation of *Brady*.                49

    D. Trial counsel's and appellate counsel's errors prejudiced the petitioner, and deprived him of a fair trial pursuant to the Sixth Amendment to the United States Constitution.                50

RELIEF REQUESTED                50

## STATEMENT OF FACTS

### *1.  Trial and Sentencing Proceedings.*

The petitioner, Eric Ogilvie, was charged with one count of assault with a dangerous Weapon (felonious assault), in violation of Mich. Comp. Laws § 750.82, and one count of possession of a firearm during the commission of a felony, in violation of Mich. Comp. Laws § 750.227b.

The charges arose due to an incident between Ogilvie and his next-door neighbor, Eric Watson, on September 13, 2009, in Taylor, Michigan.

At a jury trial, Watson testified that he approached Ogilvie who was in his own yard, on the far side of the yard. (T 54-55) [1]   Watson stated that he confronted Ogilvie about grass clippings that ended up on the sidewalk or on Watson's property. (T 54, 84-85, 94)  Watson admitted that Ogilvie told him to leave his property, and that he refused to leave Ogilvie's property. (T 56)  Watson stated that this escalated into a yelling match and admitted that he "pushed" Ogilvie. (T I 56-57) Watson testified that when he was backing away, Ogilvie pulled a gun out and pointed it at him.  (T 58)  No shots were fired.

While Watson testified that he never went back into his house before the police arrived, the responding officer, Corporal Dana Parish, contradicted his testimony by testifying he initially made contact with Watson "when he came out of his house."  (T 62, 111) Although no weapon was found on Watson's person, his house was never searched for weapons.  (T 108) Parish testified that it would have been proper procedure to search his house. (T 112-113)

At trial, Ogilvie testified that he acted in self-defense and the defense of his young son who was standing near him.  (T 130)  Ogilvie testified that he was outside tending to his lawn

---

[1] References to the trial transcript will be by "T" followed by the page.  References to the transcripts of the post-conviction hearings in the trial court will be referred to as follows:

and trimming the edge, while also watching his 3-year-old son, Logan.  (T 118)  Ogilvie stated that when Watson approached him on his yard, Watson said "if you touch my mailbox I'm going to beat your ass," referred to "shit" in the yard, and that there was no mention of grass clippings. (T 121-122)   Ogilvie testified that even before coming onto his lawn, Watson was acting "agitated," was "yelling out," and was "immediately upset." (T 118, 153)

Ogilvie stated that, after he told Watson to leave his property, he looked down to go back to his work, but Watson got "right on top of me…his nose was on my face and on my nose, his trunk area was right on my trunk or on my stomach area." (T 122) Ogilvie testified that Watson punched him in the head. (T 127)   Ogilvie stated that Watson began acting more erratic and moving his hands aggressively. (T 128-129)   Ogilvie repeatedly asked Watson to leave him alone.  (*Id*)

Ogilvie also called several times for both his neighbor, Rebecca Swanson, and Ogilvie's wife, to call 911.  (T 122-123)  At several points in the confrontation, Watson threatened Ogilvie, saying "I'm going to beat your ass…I will kill you," and "pull yours I'll pull mine."  (T 121, 128-129, 130, 137, 143)  Based on these statements, Ogilvie thought that Watson was carrying a weapon.   (*Id*)  Ogilvie yelled again for someone to call the police. (T 127) Watson began to move more erratically, putting his hands behind his back, and into his pocket, appearing to draw a weapon. (T 128-129)  Ogilvie, fearing for his and his son's life, drew his own gun in defense. (T 130) Ogilvie never fired the gun. (T 131) The gun was a licensed, legal weapon and Ogilvie was licensed to carry a concealed weapon. (T 113, 131)  At the sight of the gun, Watson finally stopped and left Ogilvie and his son alone. (T 131)

Ogilvie's next-door neighbor, Rebecca Swanson, witnessed the incident between Ogilvie and Watson.  (T 152)  Swanson had just recently moved into the neighborhood and did not know

Watson or Ogilvie.  (*Id*)  Swanson observed Ogilvie and his son outside in their yard as Ogilvie was doing lawn work and saw Watson come over into Ogilvie's yard. (T 152)  According to Swanson, Watson was yelling at Ogilvie, and Ogilvie asked Watson to "stop and to leave him alone."  (T 153-154)

Swanson testified that she observed Watson as being very upset "because of his voice, the words he was saying, and his body movement." (T 153)  Swanson testified that Watson was "very aggressive and upset as if he wanted to fight."  (T 156)  She also testified that Ogilvie was trying to get out of the situation, but Watson continued to stay in his face and was forcing the steps of Ogilvie to back up onto her lawn.  (T 156-157)   Swanson heard Ogilvie repeatedly tell Watson to stop and to leave and she watched Watson continue to act aggressively.

Swanson testified that "[Ogilvie] asked me to call 911" at least twice, and that he said he felt threatened for his life. (T 153-154)  Swanson testified that she called 911 at Ogilvie's request, she gave the 911 operator her address, said her neighbors were in a fight, and "that was when a gun was pulled out." (T 154-155)

Swanson testified, "because of [Watson's] aggressiveness and movement I did see a little hand movement everywhere." (T 158) Swanson testified that she told the police that she saw Watson reach around his back for something, but that he could have been adjusting his clothing. (T 157-158)  Swanson further testified that it was her opinion that he was pulling up his pants because she "couldn't see." (*Id*)

No evidence of the content of the 911 call by Swanson was presented at trial to the jury. In that call, she had told the police she "wasn't sure is [Watson] was pulling out a gun."  (See exhibit A, transcript of Rebecca Swanson's 911 call)  The recording of her 911 call was not produced until after trial.

Ogilvie's wife, Amy Ogilvie, exercised her spousal privilege not to testify at the trial and the audio of her three 911 calls were also never presented at the trial.

According to her 911 call, which was not produced until after the trial, she expressed concern that Watson was "gonna use a gun on my husband."  (See exhibit B, transcript of Amy Ogilvie's 911 calls)

Defense counsel requested Michigan's standard jury instructions on self-defense with a component of deadly force, Michigan Criminal Jury Instructions 2d 7.15, even though no evidence had been presented at trial to show that Ogilvie used deadly force under Michigan law.[2] Defense counsel failed to request a jury instruction on self-defense with the element of non-deadly force.

Despite the fact that Ogilvie had not used deadly force under Michigan law, the prosecution made many statements during the closing and rebuttal arguments regarding the use of deadly force.  The prosecutor began her closing argument by stating, "Is this legally justified use of deadly force in self-defense?" and later stated, "That is not a reason to use deadly force." (T 164, 166)  The prosecutor also informed the jury of the circumstances that must exist in order for a person to use deadly force and asserted that those circumstances did not exist in Ogilvie's case:

> The law allows that you can use deadly force if you feel like you are in danger of being killed, or if you are in danger of being seriously injured, or if you are in danger of a criminal sexual penetration. And I suggest to you here that the evidence has shown that none of those things were reasonable to believe at that time.  (T 164, 166)

During her rebuttal statements, the prosecutor stated, "When did the sidewalk become part of his land? When did these lines in a subdivision with no fences become a deadly threat?"

_____

[2] See Argument III below.  Threatening someone with a gun is not use of deadly force under Michigan law.

(T 175)  To complete her argument, the prosecutor reiterated that the circumstances justifying the use of deadly force in self-defense were not present in this case:

> Eric Ogilvie pulled out this gun because he thought he was going to get hit in the face or shoved down to the ground, and that is just not enough for deadly force. You can only use deadly force in certain circumstances, and there is nothing deadlier than having a loaded gun pulled out and pointed at you. (*Id*)

During her closing argument, the prosecutor also suggested that Ogilvie had a duty to retreat, when she stated, "But there was nothing that stopped him from going inside the house."[3]

After closing arguments, the court instructed the jury regarding the defense of self-defense with the element of deadly force. The jury was never instructed on the defense of self-defense with the element of non-deadly force. (T 185-189)  Thus, the jury was essentially instructed that Ogilvie used deadly force. (*Id*)  The court also instructed the jury regarding Ogilvie's duty to retreat. (T 188, 189)

The jury convicted Ogilvie of both felonious assault and use of a firearm during a felony on February 11, 2010.  On April 16, 2010, Ogilvie was sentenced to the mandatory 2 years in prison for the felony firearm, and 3 years probation for the felonious assault. (Judgment)  On December 6, 2010, Ogilvie was given a $20,000.00 personal bond pending appeal. From that point, he was on probation and bond concurrently while his appeal from his jury-based convictions was pending.

Ogilvie was then accused and convicted of probation violation due to not reporting a new address and not receiving counseling.  His appeal bond was revoked, and he was resentenced on April 29, 2011, to 1 to 4 years in prison on the conviction of felonious assault. On July 17, 2012, Ogilvie was re-sentenced again by the trial court, changing his sentences from concurrent to consecutive.

---

[3] Under Michigan law, Ogilvie had no duty to retreat.  See Argument III below.

15

**2. *The 911 Calls That Were Never Heard by the Jury.***

During the altercation on September 19, 2009, upon Ogilvie's request, a total of four 911 calls were made by, his wife, Amy Ogilvie and, his neighbor, Rebecca Swanson.  None of the 911 call recordings were presented to the jury at Ogilvie's trial, or turned over to trial counsel prior to the trial.  The recordings of the calls were discovered after the trial.

Both Swanson's 911 call and his wife's 911 calls supported Ogilvie's belief that Watson might have had a gun, as both stated their belief that Watson had a gun.

Swanson told the 911 operator that the "white neighbor [referring to Ogilvie] has a gun 'cause the black guy [referring to Watson]... Um, he was putting his hand in his pants and it didn't look like … I'm sorry, I wasn't sure if he was pulling out a gun. So I think that's why the neighbor, the other neighbor, pulled out a gun."  (See exhibit A, Transcript of Rebecca Swanson's 911 call)  Swanson continued to tell the operator that Ogilvie asked her to "call the police because the other neighbor was in his face cussing and yelling and…like to start a fight." (*Id*)  She further stated: "the neighbor, my neighbor – might've thought he had a gun so then he did pull out a gun."  (See exhibit A, Transcript of Rebecca Swanson's 911 call)

Swanson forgot what she had seen on the day of the incident, and at trial, she testified that she believed Watson was "pulling up his pants," not going for a gun.  (T 157-158)

Ogilvie's wife, Amy Ogilvie, also had made three 911 calls at Ogilvie's request.  Amy Ogilvie's statements during the calls contradicted Watson's testimony at trial and showed that she also believed that Watson looked like he was pulling out a gun.  During the first call, Amy Ogilvie said, the "…neighbor just attacked my husband… my three-year-old is outside…"  (See exhibit B, Transcript of Amy Ogilvie's 911 calls)  During the second call, Amy Ogilvie's first words were her concerns the neighbor was "…gonna use a gun on my husband," suggesting that

she also believed Watson was armed with a weapon.  When the operator asked if Watson had a

gun on him, she responded  "more than likely."  (*Id*)

None of the 911 recordings were presented to the jury to consider in determining whether

Ogilvie's belief that he faced a real threat of a neighbor with a gun and acted in self-defense and

in the defense of his son, by pulling a gun to defend himself and his son, was a reasonable action.

### 3. *Post-Conviction Motions for New Trial and Evidentiary Hearing.*

Ogilvie, with the assistance of appointed appellate counsel, filed motions for new trial

and an evidentiary hearing in the trial court on several grounds including: (1) ineffective

assistance of trial counsel for failing to investigate and discover the 911 calls; (2) the newly

discovered evidence of the 911 recordings, and (3) the prosecutor's misconduct by failing to

provide the defense with exculpatory and impeachment evidence of the Rebecca Swanson's 911

recordings pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

At an evidentiary hearing, Swanson, after she heard her 911 call, confirmed that what she

said in the 911 call was accurate, "because it was happening right then and there, quickly, where

there's a difference now." (EH1 23) Swanson also testified that the police told her that "right

away they searched and [Watson] did not have a weapon on him," so despite initially perceiving

that Watson may have been reaching for a gun, she instead reported to the police that Watson

was pulling up his shorts.  (EH1 10, 11)

Trial counsel testified that he was not aware of the substance of the 911 calls before

Ogilvie's trial.  (EH3 10) Trial counsel testified that he presented a standard discovery order to

the Taylor Police Department on or about September 21, 2009.  (EH3 15-16)  The police reports

in the discovery packet he received made references to 911 calls, but the 911 recordings or

transcripts were not in discovery.   (EH3 16)  Trial counsel admitted that he was aware that

retention policies for 911 recordings varied by each police department and could be as little as 60 days, but he did not hire a private investigator to find the recordings until December 22, 2009, more than three months after the incident.   (EH3 16-18)   Trial counsel testified that his investigator contacted the Taylor Police Department and requested copies of the recordings, but was told that the recordings had been destroyed or recorded over.  (EH3 18)  The investigator confirmed this testimony.  (EH4 4-5)  Trial counsel made no other discovery requests or attempts to obtain the recordings of the 911 calls.  (EH3 19)

At an evidentiary hearing, appointed appellate counsel for Ogilvie disclosed to the court that Ogilvie's brother, on his own, had gotten the 911 recordings, and that it had been "easy" to get those recordings.  (EH2 4)

In addition to the claims regarding the evidence of the 911 calls, Ogilvie raised several other issues in his post-conviction motions for new trial and evidentiary hearing in the trial court, including (1) erroneous jury instructions, (2) ineffective assistance of trial counsel for failing to request the proper jury instructions, and failing to object to prosecutorial misconduct, and (3) the prosecutor engaged in misconduct by mischaracterizing the evidence and making misstatements of Michigan law during closing and rebuttal statements.

Ogilvie argued that trial counsel failed to request the proper jury instructions regarding self-defense with non-deadly force.  Instead, trial counsel requested jury instructions for self-defense with deadly force.  Ogilvie also argued that he was deprived of his right to proper jury instructions where the trial court had an obligation to instruct the jury regarding self-defense with an element of non-deadly force, and that the court erred by giving an instruction on self-defense with deadly force. Ogilvie argued that the court's instruction made the presumption that deadly force was used, even though no evidence showed that Ogilvie used deadly force under Michigan

law. Ogilvie asserted that the court also erred by instructing the jury on Ogilvie's duty to retreat, where the evidence showed that no duty existed under Michigan law.

Ogilvie asserted that the prosecutor, in her closing and rebuttal argument, made misstatements of law and mischaracterized the evidence regarding the use of deadly force. Ogilvie further argued that during her closing argument, the prosecutor made improper statements regarding Ogilvie's duty to retreat.

The trial court denied Ogilvie's post-conviction motions based on the claim of ineffective assistance of counsel concerning the 911 calls, finding that trial counsel's efforts to obtain the 911 recordings were objectively reasonable.  (EH4 25)

The trial court also denied Ogilvie's motion based on a *Brady* violation for failure to disclose recordings of 911 calls.  (EH4 50)  The trial court found that, (1) the 911 recordings were not discoverable by the defendant with reasonable diligence, (2) the 911 recordings, themselves, were newly discovered evidence, (3) the 911 calls would have been admissible at trial, and (4) that the reason trial counsel did not cross-examine Swanson at trial on whether she thought Watson was reaching for a weapon was because trial counsel was not aware of the statements she made during the 911 call.  (EH4 21, 25, 26)

The trial court stated, "I would have liked to have it [the 911 recordings] if I was on the Defense side," but still found that the evidence of the 911 call would not have made a difference had it been available for trial.  (EH4 21, 27)  The court further noted that the "mishandling of the situation by the Taylor Police Department and the due diligence on the part of the Defense trying to obtain this information is something that's very disturbing to the Court."  (EH4 47, 48) Despite these findings, and stating that Swanson's opinion regarding whether Watson was merely pulling up his pants "may have been different the moment that this happened than at

trial," the trial court held that Swanson's testimony was not inconsistent with her 911 call. (EH4 21, 49)

The trial court also denied Ogilvie's motion on his claim of erroneous jury instructions, finding that trial counsel proposed the instructions and stipulated to it without objection. (MO 5) However, the trial court denied the motion without prejudice to the defendant for an evidentiary hearing, pursuant to *People v. Ginther*, 390 Mich. 436, 443; 212 N.W.2d 922 (1973), on his claim of ineffective assistance of counsel. (MO 7, 8)

The court held a *Ginther* hearing. At the *Ginther* hearing, trial counsel testified that he requested the instruction on self-defense with deadly force and did not object to the absence of an instruction on non-deadly force, despite believing that "deadly force was clearly not used by Mr. Ogilvie." (EH3 23, 24) Trial counsel further testified that he would characterize Ogilvie's actions as "the threat of the use of deadly force." (*Id*) Trial counsel also admitted that he had no strategic or tactical reasons for not having the jury consider whether Ogilvie appropriately used non-deadly force and for not objecting to the prosecutor's statements regarding Ogilvie's duty to retreat. (EH3 24, 25)

The court ruled against Ogilvie as to this claim of ineffective assistance of counsel without stating its reasoning on the record:

> And part of this may have been what was discussed in chambers or ruled upon or discussed in other hearings, but those motions are denied for reasons I believe the record supports. The claim as far as incompetence [sic] of counsel are, hearings were held, detailed hearings were held on the trial strategies or what counsel did, the Court does not find that the Court can grant the motion, the other motions of the defendant on those issues. (EH4 50, 51)

4. ***The Trial Court's Promise of Substitute Appellate Counsel on Direct Appeal, Ogilvie's Continued Request for Appointment of Appellate Counsel, and the State Court's Failure to Appoint Counsel for Appeal.***

After the evidentiary hearings in the trial court, but before briefs were prepared and filed in the Michigan Court of Appeals, Ogilvie's appointed appellate counsel moved to withdraw as appellate counsel on January 23, 2012. The trial court granted the motion on February 1, 2012.

On February 10, 2012, the Chief Judge of the Wayne County Criminal Division, Hon. Timothy M. Kenny, wrote a letter to Ogilvie promising new appellate counsel: "You will be notified when the new appellate attorney has been appointed.  I urge you to maintain a relationship with the new appellate attorney as I am unwilling to appoint a third appellate attorney to your case." (See Exhibit C, letter from Judge Kenny, February 10, 2012)

Despite persistent letters and telephone calls from Ogilvie and his family to seek new appointed appellate counsel, new appellate counsel was never appointed as promised in Judge Kenny's letter.  On February 10, 2012 (the same date as the letter from Judge Kenny to Ogilvie), Ogilvie sent a letter to Judge Kenny, stating that his last attorney "stated that I should proceed in the case going forward as my own lawyer, and also that an appeal brief is due on February 16, 2012."  Nothing was done to appoint substitute appellate counsel for Ogilvie in response to that letter.

Ten days later, on February 20, 2012, Ogilvie sent another letter to Judge Kenny requesting that "stand-by appellate counsel" be appointed to assist him in his appeal. No counsel was appointed.

There are numerous other communications and briefs to the Court of Appeals and the Trial Court, all trying to convey the fact that appellate counsel had not been appointed as a result of the February 10, 2012, letter, and that Ogilvie desperately needed appellate counsel, asking for assistance all along the way. His requests were never granted, and he was forced to proceed with his direct appeal of right in state court in pro per, out of necessity, not by choice

On June 20, 2012, Ogilvie was given until July 20, 2012, to file his brief in the Court of Appeals, and that if he was not able to meet this deadline, the clerk was to put his appeal on the involuntary dismissal docket without further notice to the parties. Ogilvie still was not able to file his brief by July 20, 2012, and requested more time. The Court of Appeals denied his motion for an additional extension and ordered that his brief must be filed within 14 days of the July 25, 2012, order denying this extension or it would be placed on the involuntary dismissal docket.

Ogilvie filed a brief himself on August 17, 2012, in the Court of Appeals.

### 5. *The Court of Appeals Decision in Ogilvie's in Pro Per Appeal.*

Ogilvie's own brief on appeal in the Michigan Court of Appeals was not timely, and as a result, he lost his right to oral argument in the Court of Appeals. Even if Ogilvie had timely filed, as a prisoner with the Michigan Department of Corrections, he would not have been able to appear for oral arguments in the Court of Appeals.

On May 23, 2013, the Court of Appeals, affirmed his convictions and sentences.  (See Exhibit D, Court of Appeals unpublished opinion, May 23, 2013)

The Court of Appeals failed to find the trial court erred on any of the claims relating to evidence of Swanson's 911 call.  The Court held that the failure to disclose the 911 calls did not deprive Ogilvie of essential facts that would permit him to take advantage of information that Swanson might be able to corroborate Ogilvie's belief that Watson was armed, and that her testimony at trial actually corroborated Ogilvie's version, excluding her testimony that Watson could have been adjusting his clothing.  The Michigan Court of Appeals found that trial counsel's failure to investigate and discover the 911 recordings was not objectively unreasonable, and that his efforts to obtain the recordings were unsuccessful because he was told that the recordings did not exist.

The Michigan Court of Appeals also denied Ogilvie's claim of prosecutorial misconduct for failing to disclose Amy Ogilvie's 911 calls to defense counsel before trial.  Because this claim was not raised in the trial court by his appointed appellate counsel, the Court of Appeals reviewed the issue for plain error and held that Amy Ogilvie's 911 call did not add any significant information that was not already before the jury.

As to trial counsel's ineffectiveness for failing to request the proper jury instructions on the use of non-deadly force, the Court of Appeals admitted that the jury instructions for self-defense with the use of non-deadly force "was more accurately tailored to the evidence in this case," but found that trial counsel's request for instructions of self-defense with deadly force did not amount to ineffective assistance of counsel because the instruction was an accurate statement of the law:

> Assuming that the jury could have incorrectly understood "deadly force" to include threatening an individual with a gun, defendant was not prejudiced because the defense theory was that such threatening conduct was the act of self-defense and that defendant honestly and reasonably believed that it was necessary to prevent death or at least great bodily harm.

Despite trial counsel's testimony that he had no strategic reason for requesting the instruction, the Court of Appeals found that trial counsel wanted the jury to hear the instruction for purposes of evaluating defendant's conduct.

Since trial counsel's proposal of the instructions and failure to object to the jury instructions constituted a waiver of the jury instructions issue, and the Court found no ineffectiveness, the Court also found no error on the issue of the jury instructions.

The Court of Appeals also affirmed the lower court's decision regarding the prosecutor's misstating the law concerning Ogilvie's duty to retreat, finding that any misleading effect of the prosecutor's remarks was cured by the trial court's accurate jury instructions on the duty to

23

retreat.[4]   The Court also found that any error from the prosecutor's mischaracterizing Ogilvie pointing a gun as involving deadly force was not outcome-determinative because the main issue was whether Ogilvie honestly and reasonably believed that it was necessary to pull out and point his gun at Watson to avoid a threat of imminent harm.

Ogilvie filed a timely application for leave to appeal in pro per in the Michigan Supreme Court from this decision of the Court of Appeals.  On November 25, 2013, the Supreme Court denied leave to appeal.

**6.  *Motion for Relief from Judgment in State Trial Court.***

On March 12, 2014, after the Supreme Court denied his application for leave, Ogilvie sent a letter in pro per to the Wayne County Circuit Court raising many issues and asking for the following relief: (1) Reissuance of the judgment and appointment of appellate counsel where he was denied appellate counsel on his direct appeal; (2) Clarification and corrections to his presentence investigation report; and (3) Reduction of his sentences due to sentencing errors. (See Exhibit E, letter to trial court, March 12, 2014)

The trial court treated the letter as a motion for relief from judgment, pursuant to Mich. Court R. 6.500 et seq., and on June 10, 2014, the trial court found that Ogilvie was promised new appellate counsel in Judge Kenny's letter of February 10, 2012, and that new appellate counsel was never appointed. (Exhibit F, Trial court opinion)  Based on these findings, the trial court held that Ogilvie showed good cause and actual prejudice as to why the issue of appointment of appellate counsel was not previously raised, and granted Ogilvie's request for appointment of appellate counsel.  The trial court denied the motion as to all other claims, finding that the issues

---

[4] As discussed below in Argument III, the court's instructions on the duty to retreat were not accurate.

24

challenging his pre-sentence report and sentences had previously been raised and decided by the Michigan Court of Appeals.  (See Exhibit F, Trial Court opinion and order, June 10, 2014)

###### 7.    *Reissuance of Judgments of Sentences and Appointment of Appellate Counsel so that Ogilvie Can Proceed with a Second Appeal with Counsel.*

Ogilvie was ultimately appointed new appellate counsel on June 16, 2014.  With new appointed counsel, Ogilvie filed a motion to reissue the judgment of his sentences in the trial court.  On September 18, 2014, the trial court granted Ogilvie's motion to reissue the judgment, finding that defendant's ability to perfect his appeal of right, with the aid of counsel, was affected, and that Ogilvie could now proceed with his direct appeal of right if the judgments were reissued.  (See Exhibit G, Trial Court opinion and order, September 18, 2014)  Both judgments were reissued on October 10, 2014. (See Exhibit H, Reissuance of Judgments, October 10, 2014)

###### 8.    *State Court's Denial of Ogilvie's Appeal of Right With New Appointed Appellate Counsel.*

Ogilvie timely filed claims of appeal on both of the reissued judgments on October 28, 2014.  On November 6, 2014, the Michigan Court of Appeals dismissed Ogilvie's claims of appeal for lack of jurisdiction because the reissuance of the judgments of sentences were "not a final order as defined in MCR 7.202(6). MCR 7.203(A)(1)."

On November 14, 2014, Ogilvie filed a motion to correct an invalid sentence in the trial court, pursuant to Mich. Court R. 6.429.  A hearing on this motion was held on November 21, 2014, before Hon. Bruce U. Morrow.  At the outset of the hearing, Judge Morrow questioned why the trial court had "jurisdiction to hear" the motion.  (Motion to Correct Sentence, 3) Ogilvie's counsel responded that since the Court of Appeals dismissed the claim of appeal for lack of jurisdiction, resentencing in the trial court would be appropriate within six months of the

reissued judgments under Mich. Court R. 6.429.  (Motion to Correct Sentence, 3, 4)  However, Judge Morrow denied the motion based on its conclusion that the trial court did not have jurisdiction, and that it should be argued in the Court of Appeals:

> …But argue it in the Court of Appeals.  I'm not going to hear the argument.  So, your motion is denied, sir.  Your remedies, if any, lie in the Court of Appeals, and you can rely, as your say, on the re-issuance of that order providing him with assistance of counsel.  (Motion to Correct Sentence, 18)

On December 1, 2014, Ogilvie complied with the order of the trial court and timely moved for reconsideration in the Court of Appeals for both cases pursuant to Mich. Court R. 7.203(F)(2).   On January 15, 2015, the Court of Appeals denied these motions stating, "Restarting the time to file an appeal of right under MCR 6.428 is only appropriate when 'the defendant did not appeal within the time allowed by MCR 7.204(A)(2);' the rule does not apply when the defendant has already pursued an appeal to conclusion in this Court."  The Court of Appeals did not address the fact that Ogilvie's first appeal was without the assistance of counsel. The court did not address the fact that the trial judge would not resentence the petitioner.

Ogilvie filed timely applications for leave to appeal in the Michigan Supreme Court.  On September 9, 2015, the Michigan Supreme Court denied leave to appeal.

**ARGUMENT**

***Standard of Review***

A federal court may grant a writ of habeas corpus with respect to a state court judgment where the adjudication of the state claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of facts in light of the evidence.  28 U.S.C. § 2254(d); *Maples v. Stegall,* 340 F.3d 433, 436 (6th Cir. 2003).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

> *Williams v. Taylor*, 529 U.S. 362, 412-413, (2000).

The petitioner asserts that, as to each constitutional violation raised in his petition and brief, the state court's review of the violation resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of facts in light of the evidence. The state courts ignored the evidence and applicable federal law, and demonstrated a severe malfunction in this case, for which federal habeas relief is the proper, and only, remedy.  *Burt v. Titlow*, 134 S. Ct. 10 (2013).

**I.     This petition for habeas corpus is timely filed.**

28 U.S.C. § 2244(d)(1)(A) provides that a petition for writ of habeas corpus shall be filed by a petitioner within one year of "the date on which the [state court] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."   In *Bronaugh v. Ohio*, 235 F.3d 280 (6th Cir. 2000) the Sixth Circuit held that this statutory

language means that a petitioner has one year and 90 days from the denial of leave by the highest state court in his direct appeal to file his petition, if he does not apply for certiorari to the United States Supreme Court.

In this case, the judgment of the petitioner became final 90 days after the Supreme Court denied leave in his direct appeal, 90 days after November 25, 2013, or on February 24, 2014.

U.S.C. § 2244(d)(2) provides that the limitations period for filing a habeas petition is tolled during the pendency of a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment." § 2244(d)(2) "provides a powerful incentive for litigants to exhaust *all* available state remedies before proceeding in the lower federal courts." *Wall v. Kholi*, 562 U.S. 545, 558 (2011) (emphasis in original), quoting *Duncan v. Walker*, 533 U.S. 167, 180 (2001). The United States Supreme Court has defined "collateral review" as "a judicial reexamination of a judgment or claim in a proceeding outside of the direct review process." *Wall v. Kholi*, 562 U.S. at 553.   Thus, under § 2244(d)(2), the limitations period for filing a habeas petition is tolled during the pendency of any state collateral proceeding. The tolling provision in § 2244(d)(2) also "cover[s] the time between a lower state court's decision and the filing of a notice of appeal to a higher state court." *Carey v. Saffold,* 536 U.S. 214, 219–21 (2002).

An application for post-conviction relief or other collateral review is "properly filed" for purposes of 2244(d)(2) "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, ... the time limits upon its delivery." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000); *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir.2001).

In this case, Ogilvie, less than 30 days after his judgment became final, sent a letter in pro per on March 12, 2014, to the Wayne County Circuit Court indicating many issues including denial of appellate counsel on direct appeal where he was promised counsel.  (See Exhibit E, letter to trial court, March 12, 2014).  This was his attempt to exhaust the issue of having had an appeal without counsel.  On June 10, 2014, the trial court entered an order and opinion, which treated the letter as a motion for relief from judgment, pursuant to Mich. Court R. 6.500 et seq. (See exhibit F, Trial Court opinion and order of June 10, 2014)  The trial court granted the motion as to the issue of denial of appellate counsel and denied the motion as to all other claims. The trial court then reissued the judgments so Ogilvie would have a direct appeal with assistance of counsel.

Ogilvie then took his second appeal with counsel by timely filing a claim of appeal in the Court of Appeals.  The Court of Appeals denied his second appeal, Ogilvie appealed to the Michigan Supreme Court, and on September 9, 2015, the Michigan Supreme Court denied his application for leave.

The time period to file Ogilvie's habeas petition was tolled on March 12, 2014, when he sent the letter to the trial court that was treated as a post-conviction motion for relief from judgment under Mich. Court R. 6.500 et seq., and remained tolled until September 9, 2015, when the Michigan Supreme Court denied leave.  From September 9, 2015, the petitioner had almost a full year remaining to file his petition for habeas corpus, and has filed within that time.

Ogilvie has diligently pursued his rights, particularly his right to appeal with counsel, and the state courts continued to deprive him of this constitutional right to a direct appeal with counsel.  In the circumstances where a petitioner has diligently pursued his constitutional rights in state court but the state courts deny him those rights, any petition he files is deemed to be

29

timely filed. *Holland v. Florida*, 560 U.S. 631, 649 (2010); *Ross v. McKee*, 465 F. App'x 469, 476 (6th Cir. 2012).

The merits of Ogilvie's constitutional claims in this petition should be considered regardless of any applicable time limits because he is actually innocent of the offenses of conviction. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931, 185 L. Ed. 2d 1019 (2013). Actual innocence can be established where the petitioner supports his claims of constitutional error with new evidence of trustworthy eyewitness accounts that were not presented to the jury at trial, and in light of all of the evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005). As discussed below in Arguments IV and V, the central issue at trial was whether Ogilvie honestly and reasonably believed that Watson was armed and reaching for a gun, to justify Ogilvie's display of his gun in support of his claim of self-defense. The new evidence of the 911 calls, which were not produced at trial, contain eyewitness statements that unequivocally establish that Ogilvie's belief that Watson had a gun was shared by the callers, and was reasonable. (See exhibits A and B, transcripts of 911 calls of Rebecca Swanson and Amy Ogilvie.) The recordings would have produced a different outcome. Had this evidence been presented to the jury, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Souter v. Jones*. (Exhibit I, juror affidavit of Brenda Hart-Price)

II.  **Petitioner was denied his right to assistance of counsel in his direct appeal of right in violation of his rights under the Sixth Amendment of the United States Constitution.**

A criminal defendant has a constitutional right to effective assistance of counsel in his first appeal of right.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  Generally, where a defendant complains about errors of his counsel in a criminal case, the defendant must show both deficient performance of the counsel and prejudice to his case to establish a claim of ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984).  However, a defendant does not have to show prejudice where he or she is denied the assistance of any counsel at a critical stage of criminal proceedings.  The "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."  *Id.* at 692.  A complete denial of counsel at any critical stage in a criminal proceeding is constitutional error.  *United States v. Cronic*, 466 U.S. 648, 659 (1984).

The presumption of prejudice from the denial of counsel at a critical stage of the proceedings has been extended by the Supreme Court to the complete denial of counsel on direct appeal; the denial of the fundamental right to counsel on appeal can never be considered harmless error.  *Penson v. Ohio*, 488 U.S. 75, 88 (1988).

In this case, after filing his claim of appeal, but before briefs were filed, Ogilvie's appellate counsel filed a motion to withdraw in the trial court. After the trial court granted appellate counsel's motion to withdraw, Ogilvie requested counsel, and was told by the chief judge that counsel would be appointed for him.  (See exhibit C, letter from Judge Kenny, February 10, 2012)  Despite several letters to the trial court and court of appeals requesting substitute counsel, counsel was never appointed. (See detailed discussion of Ogilvie's persistent requests for assistance of counsel in Section 5 of the Statement of Facts of this brief)  Ogilvie, a state prisoner in the custody of the Michigan Department of Corrections, was forced to proceed

31

in pro per in the Court of Appeals against his own wishes. The Court of Appeals affirmed Ogilvie's convictions and sentences, and the Michigan Supreme Court denied leave, all when Ogilvie was without counsel. Thus, the Michigan courts deprived Ogilvie of his right to appellate counsel in his appeal of right to the Michigan Court of Appeals, in violation of his constitutional rights to counsel and due process of law.

Ogilvie hired counsel and filed a post-appeal motion in the trial court. The trial court reissued the judgments, so Ogilvie could have an appeal of right with counsel. Counsel then appealed the conviction of Ogilvie to the Court of Appeals. However, the Michigan Court of Appeals and the Michigan Supreme Court both refused to hear the appeal or grant Ogilvie an appeal with counsel.

The Michigan courts have totally and completely denied Ogilvie the assistance of counsel on appeal – twice. Once, he received an appeal, but without counsel. A second time, he received counsel, but was denied an appeal.

Although Ogilvie represented himself in his appeal of right, and filed a brief in the court of appeals on his behalf, that self-representation cannot be construed to waive his right to counsel. The United States Supreme Court has established that an indigent defendant's right to counsel on appeal will not be deemed waived even in the absence of a request for appointment of appellate counsel. *Swenson v. Bosler*, 386 U.S. 258, 260, (1967). In *Swenson*, trial counsel had filed a motion for new trial and a notice of appeal in state court, and then withdrew from the case. *Id*. at 259. The Missouri Supreme Court had no rule requiring appointment of counsel for indigent defendants, and the court decided the appeal without assistance of counsel. *Id*. The United States Supreme Court reversed the state court's decision, holding that the defendant was constitutionally entitled to appointment of counsel on appeal even though he did not request the

appointment of appellate counsel. *Id.* at 259-60. The Court reasoned that the failure to request a state-appointed attorney does not constitute a waiver of counsel where it is apparent that the defendant is indigent and desires an appeal. *Id.* Here, Ogilvie persistently requested the appointment of counsel.

Ogilvie's filing of his own brief cannot be viewed as an exercise of his right to self-representation. A criminal defendant may choose to exercise his right of self-representation only if he knowingly, intentionally, and voluntarily waives the right to counsel on the record. *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001). "To ensure that a defendant's waiver is made with eyes wide open, a judge must thoroughly investigate the circumstances under which the waiver is made." *Id.* "[T]he court must indulge every reasonable presumption against waiver of an individual's fundamental constitutional rights." *Id.*

Ogilvie at no time waived his right to appellate counsel. A defendant cannot knowingly, voluntarily, and intelligently waive his right to appellate counsel unless the record reflects that the court informed the defendant of his right to appellate counsel and the disadvantages of self-representation, and the defendant's choice to relinquish his right to appellate counsel is made "with eyes open." *Forster v. Steward*, 360 F. Appx 604, 605-06 (6th Cir. 2010). In *Forster*, the Sixth Circuit held that the state court's denial of the defendant's request for appellate counsel was an unreasonable application of federal law when the state court erroneously found that the defendant's waiver of his right to trial counsel at sentencing was also a waiver of his right to appellate counsel. *Id.* at 605-06. The Court remanded the case to the district court with instructions to grant habeas relief requiring the state court to reinstate the defendant's direct appeal with the assistance of counsel or release him from custody. *Id.*

33

Ogilvie's post-appeal motion, asking again for the appointment of counsel for appeal, did not cure the constitutional violation that occurred when he was denied counsel on his direct appeal. "A post-conviction motion filed without the assistance of counsel where the right to counsel has not been waived is not an 'adequate substitute for direct appellate review.'" *Bridges v. Berghuis*, No. CIV.A. 06-CV-10566, 2009 WL 2488098, at 6 (E.D. Mich. Aug. 13, 2009). And, although the motion spewed the trial court to attempt to grant Ogilvie an appeal with counsel, the Michigan appellate courts refused to hear the appeal.

The failure to appoint counsel for Ogilvie's direct appeal constituted a violation of his constitutional rights to due process. The Michigan courts deprived Ogilvie of his right to appeal with counsel on his direct appeal two times, first on his direct appeal when counsel was denied, and then on a second appeal when the appellate courts would not hear the appeal. This violation of his rights to counsel and due process of law as guaranteed under the Constitution entitles Ogilvie to a reinstatement of his direct appeal with the assistance of counsel by the Michigan courts or to be released from custody.

**III.    Instructing the jury on self-defense with the element of deadly force and instructing on the petitioner's duty to retreat were erroneous instructions that went to the heart of the case before the jury and violated the petitioner's right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

The Sixth Amendment commands that the state must afford a trial with a jury at the defendant's request in serious criminal cases. *Duncan v. Louisiana*, 391 U.S. 145 (1968). Consequently, due process requires that the defendant be tried by a properly instructed jury. *Sullivan v. Louisiana*, 508 U.S. 275, 277-278 (1993). See also *Apprendi v. New Jersey*, 530 U.S. 466 (2000). As a matter of federal due process the prosecution must prove beyond reasonable doubt every fact necessary to constitute the crime charged. *Berrier v. Egeler*, 583 F.2d 515, 521 (6th Cir. 1978).

On habeas review, the test is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72, (1991), quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973).  In evaluating the impact of the jury instructions, the courts will consider the claim in the context of the instructions and trial record as a whole. *Estelle v. McGuire*, 502 U.S. at 72.

In this case, the jury instructions incorrectly instructed the jury that Ogilvie's pulling his gun to defend himself was the use of deadly force.   The jury was never correctly instructed on self-defense using non-deadly force.  The instructions also incorrectly told the jury that Ogilvie had a duty to retreat.   The erroneous jury instructions "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire.*

Under Michigan law, where a defendant asserts a claim of self-defense, the prosecution bears the burden of disproving self-defense beyond a reasonable doubt. *People v. Dupree*, 486 Mich. 693, 709-710; 788 N.W.2d 399 (2010).

Mich. Comp. Laws § 780.972 provides the circumstances under which a person has the right to use deadly force and the circumstances where a person has a right to use non-deadly force:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be *with no duty to retreat* if either of the following applies:
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.
> (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.
>
> (2) An individual who has not or is not engaged in the commission of a crime at the time he or she uses force other than deadly force may use force other than deadly force against another individual anywhere he or she has the legal right to

be *with no duty to retreat* if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual. (emphasis added)

Although the state statute does not define "deadly force" or "force other than deadly force," Michigan courts have interpreted "deadly force" as referring to a circumstance where the natural, probable, and foreseeable consequence of the defendant's act is death. *People v. Pace*, 102 Mich. App. 522, 534; 302 N.W.2d 216 (1980).   In *Pace*, the Michigan Court of Appeals found that a defendant's mere display of a knife did not constitute deadly force, and that an instruction on non-deadly force would be appropriate. *Id.* at 533-534.  In *People v. Dillard*, 115 Mich. App. 640, 642; 321 N.W.2d 757 (1982), the Michigan Court of Appeals recognized that merely pointing a gun, without firing it, involves no force whatsoever.  Michigan courts have ruled that it is the firing of the gun, not the possession of the gun, that determines if deadly force or non-deadly force instructions should be provided to the jury.  *People v. Hooper*, 152 Mich. App. 243, 247; 394 N.W.2nd 27 (1986)   (where gun was actually fired, the deadly force instructions should be used; non-deadly instructions not appropriate because gun discharged).

In this case, the evidence at trial showed unequivocally that Ogilvie merely drew his gun without firing it, because his neighbor made threatening comments, and appeared to be drawing a weapon. (T 58, 128-129, 131)

Thus, under Michigan law, the evidence at trial showed that Ogilvie's actions, by merely pointing the gun without firing it, did not amount to "deadly force."  Therefore, the jury instructions for self-defense with the element of non-deadly force would have provided a proper and lawful calculus for determining guilt or innocence in this case.

However, at defense counsel's request, the court instructed the jury regarding the defense of self-defense with the element of deadly force:

36

First, at the time he acted the Defendant must have honestly and reasonably believed he was in danger of being killed or seriously injured or sexually assaulted.

…

Second, a person may not kill or seriously injury [sic] another person just to protect himself against what seems like a threat of only minor injury. The Defendant must have been afraid of death or serious physical injury or sexual assault. (T 185-186).

The jury was never instructed on self-defense with the element of non-deadly force, nor did the court provide any direction or instruction on the difference between deadly and non-deadly force.

The trial court also instructed the jury regarding Ogilvie's duty to retreat:

A person can use deadly force in self-defense only where it's necessary to do so. If the defendant could have safely retreated, but did not do so, you may consider that factor in deciding whether the Defendant honestly and reasonably believed he needed to use deadly force in self-defense. (T 188, 189)

However, under Michigan's Self-Defense Act, as quoted above, Ogilvie had no duty to retreat because he was not in the commission of a crime and was standing on his property, a place where he had a legal right to be. Mich. Comp. Laws § 780.972(2).

The instructions given to the jury in this case provided that if the jury found Ogilvie faced "a threat of only minor injury," then self-defense was to be considered disproved. (TI, 186). This was a serious error that was exploited by the prosecutor who continually harped on there being no justification for the defendant's use of "deadly force." See Argument IV.A. below.

The trial court denied Ogilvie's motion on his claim of erroneous jury instructions going to the criminal elements of self-defense. The trial court found that trial counsel proposed the instructions and stipulated to them without objection. At the same time, the trial court found no ineffective assistance of counsel in submitting erroneous instructions, and agreeing to other erroneous instructions.

The Court of Appeals affirmed the trial court's rulings, using strange logic.  The Court found that the instructions of self-defense with deadly force was an "accurate statement of the law," and "reflected the defense theory at trial," which was self-defense.  The Court never squarely addressed the fact that the instructions, although an accurate statement of the law, were not an accurate statement of the law *applicable to Ogilvie's case*.  The instructions on self-defense with deadly force did not reflect Ogilvie's defense theory because his theory was that he used *non-deadly force*, by pointing his gun, to protect against the use of force by Watson against him and his son.  (T 128-129)  Mich. Comp. Laws § 780.972(2).

The Court of Appeals, applying the same strange logic, also found no error regarding the instructions on Ogilvie's duty to retreat, as the instruction was an "accurate statement of the law," even though Ogilvie had no duty to retreat, and thus, the duty to retreat was not applicable to this case.

The court's instructions on self-defense with the element of deadly force and Ogilvie's duty to retreat allowed the prosecutor to argue that Ogilvie used deadly force, even though no evidence showed that Ogilvie used deadly force under Michigan law. These instructions actually shifted the burden to Ogilvie to prove that he did not use deadly force.

The decisions of the trial court and the court of appeals finding the erroneous jury instructions somehow appropriate were an egregious, unreasonable determination of the facts of the case and an unreasonable application of the constitutional principles of *Estelle v. McGuire*.

A reasonable juror could have objectively found Ogilvie not guilty pursuant to the applicable law, Mich. Comp. Laws § 780.972(2), had the jury been properly instructed.  *Estelle v. McGuire*, 502 U.S. at 72.  (See Exhibit I, juror affidavit of Brenda Hart-Prince)  The instructions on deadly force, and the absence of instructions on non-deadly force, relieved the

prosecutor's burden of disproving that Ogilvie's use of non-deadly force was "necessary to defend himself…from the imminent unlawful use of force by another individual" and justified, pursuant to Mich. Comp. Laws § 780.972(2). The jury instructions on the duty to retreat added a burden to Ogilvie's case that was contrary to Michigan law.  The erroneous jury instructions infected the entire trial and deprived Ogilvie of his right to due process of law.  *Estelle v. McGuire.*

Ogilvie is entitled to vacation of his convictions, and release from custody.

**IV.    The petitioner was denied his right to a fair trial, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because of the pervasive misconduct of the prosecutor (1) in arguing that Ogilvie used deadly force and had a duty to retreat, when no deadly force was used by Ogilvie and he had no duty to retreat, and (2) in failing to produce exculpatory evidence.**

The role of a prosecutor, as a public official, has long been acknowledged by the United States Supreme Court as a participant in the criminal justice system whose duty is to see that justice is done and that defendants receive fair trials, not whose duty is to obtain convictions. *Berger v. United States*, 295 U.S. 78, 88-89 (1935).  "[A prosecutor] may prosecute with earnestness and vigor, indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones."  *Berger*, 295 U.S. at 88.  Substantial and material prosecutorial misconduct denies the defendant his constitutional right to a fair trial.  U.S. Const., Ams V, VI, XIV; *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The test of prosecutorial misconduct, recognized by the United States Supreme Court is whether the defendant was denied a fair and impartial trial.  *Donnelly v. DeChristoforo*.

In the instant case, the prosecutor engaged in misconduct by (1) misstating the law applicable to the defendant's defense of self-defense and mischaracterizing evidence during closing and rebuttal arguments, and (2) failing to provide the defense with

exculpatory/impeachment evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

A. **During closing and rebuttal arguments, the prosecutor made misstatements of Michigan's self-defense law, mischaracterized evidence of petitioner pointing a gun as deadly force, and wrongfully suggested that the petitioner had a duty to retreat, when in fact, under Michigan law, pointing a gun is not deadly force, and petitioner had no duty to retreat.**

It is clearly established federal law that prosecutorial misconduct amounts to a due process violation of the federal constitutional rights of the defendant "if the relevant misstatements [of the prosecutor] were so egregious as to render the entire trial fundamentally unfair . . . ." *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000)*; Caldwell v. Russell*, 181 F.3d 731 (6th Cir. 1999)*; and Donnelly v. DeChristoforo.  See also, Martin v. Parker,* 11 F.3d 613 (6th Cir. 1993) and *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir. 1982).

During closing and rebuttal arguments, the prosecutor made several statements that Ogilvie, by pointing a gun, used "deadly force" and that his use of "deadly force" cannot be justified because Ogilvie was not "in danger of being killed, seriously injured, or in danger of a criminal sexual penetration" as required by Michigan's self-defense act when deadly force is used.  (T 164, 166, 175)  The prosecutor also wrongfully suggested that Ogilvie had a duty to retreat.  (T 175)

As discussed above in Argument III, under Michigan law, Ogilvie by pulling a gun and not shooting it, did not use "deadly force" nor was he required to retreat where he did not use deadly force.

The Court of Appeals found that any misleading effect of the prosecutor's remarks was cured by the trial court's accurate jury instructions on the duty to retreat. The Court also found that any error from the prosecutor's mischaracterizing Ogilvie pointing a gun as involving deadly

40

force was not outcome-determinative because the main issue was whether Ogilvie honestly and reasonably believed that it was necessary to pull out and point his gun at Watson to avoid a threat of imminent harm.

The state courts' findings were egregiously unreasonable, contrary to the evidence produced at trial, and in complete defiance of Michigan law.  The prosecutor's statements communicated a fundamental misunderstanding of the law to the jury, increased Ogilvie's burden of proof, and diminished the prosecutor's burden of proof.  The remarks by the prosecutor prejudiced Ogilvie and misled the jury to believe that Ogilvie's act of pointing the gun, without firing it, constituted deadly force. The prosecutor misled the jury to believe that Ogilvie's claim of self-defense would be valid only if he was in danger of death, great bodily injury, or criminal sexual assault.  (T 164, 166, 175)  The prosecutor also suggested that Ogilvie had a duty to retreat, even though no duty existed under Michigan law.  Mich. Comp. Laws § 780.972(2).  Contrary to the Court of Appeal opinion, the court *did not* give a correct instruction on the duty to retreat.

The prosecutor made misstatements of Michigan's Self-Defense Act, and mischaracterized evidence many times throughout her closing and rebuttal statements; these were not isolated incidents, or made accidentally.  (T 164, 166, 175)  The evidence was insufficient to disprove Ogilvie's claim of self-defense using non-deadly force, pursuant to Mich. Comp. Laws § 780.972(2).  Watson, Ogilvie's neighbor, admitted that he refused to leave Ogilvie's property, he "pushed" Ogilvie, and that Ogilvie pointed, but did not discharge, the gun.  (T 56-58)  Swanson corroborated Ogilvie's testimony that Ogilvie's son was standing near him, Watson continued to act aggressively, and that Ogilvie felt threatened.  (T 130, 153-153, 156-157)  The 911 recordings that were never disclosed by the prosecutor showed that *both* people

41

who called the police believed that Watson was armed and was going for his gun, as Ogilvie believed.  Had the jury not been misled by the prosecutor's blatant misstatements of law, the jury would have found that Ogilvie acted in self-defense using non-deadly force to protect against Watson's threat of imminent harm to him and his son.

**B. The prosecution failed to provide the defense with the exculpatory and admissible evidence of the 911 calls to the police, which contradicted witness testimony, and was crucial to the petitioner's valid claim of self-defense because both callers believed the neighbor who attacked Ogilvie had a gun.**

In *Brady v. Maryland*, 373 U.S. at 87, the United States Supreme Court held that a prosecutor is obligated to turn potentially exculpatory information over to the defense because "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The Court subsequently held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Such evidence is material to guilt "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 at 682; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995).  The rule requires production of evidence "known only to police investigators and not to the prosecutor."  *Id.* at 438.  In order to comply with *Brady*, therefore, "*the individual prosecutor has a duty to learn* of any favorable evidence known to the others acting on the government's behalf in this case, including the police."  *Kyles,* 514 U.S., at 437 (emphasis added).

In this case, the prosecution's failure to disclose the evidence of the four 911 calls made by Amy Ogilvie and Rebecca Swanson materially affected the outcome of the trial, because the

42

evidence contained statements, including a statement from a witness that did not testify at trial (Amy Ogilvie), that contradicted witness testimony and showed that Ogilvie faced a real threat from his neighbor, who appeared to be going for a gun, and that he acted in self-defense.

The prosecutor never bothered to inquire into the existence of the recordings of the 911 calls, even though it was apparent that two people called. The prosecutor had a duty to learn of this evidence and disclose it. As discussed above in Argument III, the 911 recordings communicated a strong belief of *both* people who called 911, that Watson had a gun, and corroborated Ogilvie's belief that he had to defend himself against a gun-wielding neighbor.

The testimony at trial, in the absence of the recordings, never communicated the witnesses' belief that Watson had a gun. Swanson testified that she told the police that she saw Watson reach around his back for something, but that he could have been adjusting his clothing. (T 157-158) She further testified that it was her opinion that he was pulling up his pants. (*Id*) Amy Ogilvie never testified at trial.

The trial court denied Ogilvie's motion for new trial on the basis of the excluded 911 calls. (EH4 50) The trial court found that the 911 calls *would have been admissible* at trial, and that the reason trial counsel did not cross-examine Swanson at trial on whether she thought Watson was reaching for a weapon was because *trial counsel was not aware of the statements* she made during the 911 call. (EH4 21, 25, 26) Despite these findings, and stating that Swanson's opinion regarding whether Watson was merely pulling up his pants "*may have been different the moment that this happened than at trial*," the trial court held that Swanson's testimony was somehow not inconsistent with her 911 call. (EH4 21, 49)

The Michigan Court of Appeals held that the failure to disclose the 911 calls did not deprive Ogilvie of essential facts that he could have used at trial, that Swanson's trial testimony

43

corroborated Ogilvie's version, excluding her testimony that Watson could have been adjusting his clothing, and that Amy Ogilvie's 911 call did not add any significant information that was not already before the jury.

This decision of the Michigan Court of Appeals not only was objectively unreasonable, but it defies logic and reasoning.

The Michigan courts' decisions that the 911 calls would not have made a difference at trial is at the least, an unreasonable application of *Brady,* and was based on an unreasonable determination of the facts in light of the evidence in this case.  28 U.S.C. § 2254(d).  The trial hinged upon whether the prosecution disproved beyond a reasonable doubt that Ogilvie honestly and reasonably believed he faced an imminent threat of harm—a neighbor with a weapon.   The 911 calls would have provided defense counsel with important impeachment evidence, contradicted Watson's version of events, and corroborated Ogilvie's claim that he faced a real threat from Watson – it looked like Watson was going for his gun.  The fact that the jury was not able to consider the 911 calls, in determining whether Ogilvie honestly and reasonably believed that Watson was armed and reaching for a gun, to justify Ogilvie's display of his gun, materially affected the outcome of Ogilvie's trial.  (See Exhibit I, juror affidavit of Brenda Hart-Prince)

Based on the misconduct of the prosecutor, Ogilvie is entitled to vacation of his conviction and release from custody.

V.     **The petitioner received ineffective assistance of trial and appellate counsel, in violation of his rights under the Sixth Amendment of the United States Constitution.**

The defendant in a criminal case has a constitutional right to the assistance of counsel, which includes the right to the effective assistance of counsel.  The test for ineffective assistance of counsel claims is whether counsel's performance was deficient and whether counsel's deficient performance actually prejudiced the defendant.  Counsel's performance is deficient

when it falls below an objective standard of reasonableness.  U.S. Const., Ams. VI and XIV; *Strickland v. Washington*, 466 U.S. 668 (1984); *Groseclose v. Bell*, 130 F.3d 1161 (6th Cir. 1997).  While counsel is presumed to have been effective, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.  In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."  *Strickland v. Washington*, 446 U.S. at 696.

The right to effective assistance of counsel is a firmly established Constitutional right that can be enforced by federal courts in habeas review of state court proceedings, if the state courts review of the effectiveness of counsel involved an unreasonable application of this clearly established federal constitutional right, or resulted in a decision that was based on an unreasonable determination of facts in light of the evidence.

The findings of state court that trial counsel for Ogilvie was not ineffective were unreasonable applications of the *Strickland* standard, and an unreasonable determination of the facts of this case.

**A.  Trial counsel failed to investigate and obtain 911 calls and transcripts containing admissible statements that contradicted the complainant's testimony and were fundamental to petitioner's self-defense theory.**

If trial counsel had either adequately investigated the case, or obtained the discovery he was entitled to, he would have discovered the 911 call recordings, including a call from a witness that did not testify at trial, that would have contradicted the complainant's testimony, and would have showed that Ogilvie had a valid claim of self-defense because his belief that Watson was armed was shared by the people who called 911.  Trial counsel's failure to adequately investigate and discover the 911 recordings constituted ineffectiveness under *Strickland*.

As discussed at the post-conviction hearings, these recordings were "easy" to obtain and were obtained by Ogilvie's brother, who is not a lawyer. (EH2 4)

The Supreme Court of the United States has made it clear that when counsel has failed to properly and thoroughly investigate or prepare, that the presumption of effectiveness no longer applies. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

A lawyer has a duty to investigate thoroughly. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (decision of trial counsel not to investigate must be assessed for reasonableness under all the circumstances); see also *Wiggins v. Smith*, 539 U.S. at 533. While counsel's conduct might be presumed to be reasonable, a duty to investigate is also required under the "prevailing professional norms." See *Strickland*, 466 U.S. at 688-689. Those "prevailing professional norms" are judged, in part, by the American Bar Association's Standards for Criminal Justice. See *Rompilla*, 545 U.S. at 375; *Wiggins*, 539 U.S. at 524. The standard relating to the duty of counsel to investigate states in part:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities."ABA Standards for Criminal Justice, Defense Function, Part IV, Investigation and Preparation, 4-4.1(a).

The relevant commentary to Standard 4-4.1 states in part:

> The effectiveness of advocacy is not measured solely by what the lawyer does at trial; without careful preparation, the lawyer cannot fulfill the advocate's role. Failure to make adequate preparation and investigation may also be grounds for finding ineffective assistance of counsel.

46

The trial court and Michigan Court of Appeals found that trial counsel's failure to investigate and discover the 911 recordings was not objectively unreasonable, and that his efforts to obtain the recordings were simply unsuccessful because he was told that the recordings did not exist.

These findings of the state courts were objectively unreasonable and contrary to the evidence produced. Trial counsel's efforts were not unsuccessful because he was told the recordings did not exist as the Court of Appeals concluded. Trial counsel's efforts to obtain the recordings were unsuccessful because he did not even begin to investigate until more than three months after the 911 calls were made, despite knowing that the retention polices varied for each police department, and could be as little as 60 days. (EH3 16-18)  In fact, the Taylor Police Department did not even have a retention policy in 2009.  (EH3 31)  After being told by his investigator that the 911 recordings had been written over, trial counsel failed to make any additional attempts to find them or inquire about the department's retention policy.  (EH3 18, 19)  Had trial counsel adequately investigated, he would have discovered the recordings, just as Ogilvie's brother eventually discovered them.  As discussed above in Arguments III and IV, the 911 call recordings were extremely important evidence that should have been presented to the jury, and trial court's failure to obtain them constitutes ineffective assistance of counsel under *Strickland*.

**B. Trial counsel failed to request the appropriate jury instructions where the jury was instructed that petitioner used deadly force even though, under Michigan law, deadly force was not used, and the petitioner was entitled to an instruction on the element of non-deadly force as a component of self-defense.**

As discussed above in Section III of this brief, the jury instructions agreed to by trial counsel regarding self-defense with deadly force and the duty to retreat were grossly erroneous, impermissibly prejudiced Ogilvie, and violated his right to due process of law.

Trial counsel requested Michigan's standard jury instructions on self-defense with a component of deadly force, Criminal Jury Instructions 2d 7.15, even though no evidence had been presented at trial to show that Ogilvie used deadly force under Michigan law.  (See discussion in Argument III above)  Trial counsel also failed to request a jury instruction on self-defense with the element of non-deadly force.  The trial court denied Ogilvie's motions on this ground and the Court of Appeals affirmed its decision.  The Court of Appeals found that trial counsel's request for instructions of self-defense with deadly force did not amount to ineffective assistance of counsel because the instruction was an "accurate statement of the law." The Court of Appeals ignored trial counsel's testimony that he had *no strategic reason for requesting the deadly force instruction*.  (EH3 24, 25)  The Court of Appeals found that trial counsel wanted the jury to hear the instruction for purposes of evaluating defendant's conduct, a conclusion that made absolutely no sense in the context of this case.

It was an unreasonable application of the *Strickland* standard, and an unreasonable determination of the facts in this case, for the Court of Appeals to find that trial counsel would have wanted the jury to hear an instruction on self-defense with deadly force, when it made his claim of self-defense more difficult. (T 58, 130-131; EH3 23, 24)  Trial counsel admitted to having no strategic reason for requesting the deadly force instructions and not requesting the non-deadly force instructions.  (EH3 24, 25)  The Court's finding, that trial counsel would want the jury to hear an instruction that did not even apply to Ogilvie's case, and that actually relieved the prosecutor's burden of disproving the appropriate claim of self-defense with non-deadly force, defies logic.  Requesting the wrong jury instructions was ineffective assistance of counsel, and violates the standards for ineffective assistance of counsel standard in *Strickland*.

**C.  In petitioner's post-conviction motions in state trial court, appellate counsel failed to raise the meritorious appellate issue of prosecutorial misconduct for failing to disclose evidence of Amy Ogilvie's 911 calls in violation of *Brady*.**

A defendant is Constitutionally entitled, by the Sixth Amendment, to the effective assistance of counsel through the exhaustion of his direct appeal.  *Evitts v Lucey*; *Mapes v Coyle*, 171 F3d 408, 427-428 (CA 6 1999); *Franklin v Anderson*, 434 F3d 412, 428-429 (CA 6, 2006). The failure to provide effective assistance of counsel in state court violates a defendant's right to due process of the law under the Fourteenth Amendment.  *Evitts v Lucey*.   Whether appellate counsel was ineffective should be reviewed under the standard established by *Strickland v Washington*. See discussion of *Strickland* above.

Where appellate counsel fails to raise a claim on appeal, or perfect a claim on appeal, and if such a claim had been raised, it would have resulted in relief being granted, there is ineffective assistance of appellate counsel under the Sixth Amendment *Strickland* standard.  *See, Franklin v. Anderson*.

For the reasons set forth above in Argument IV.B., appointed appellate counsel could have raised a meritorious claim in state trial court that the prosecutor violated *Brady* when he failed to disclose evidence of Amy Ogilvie's 911 calls.  Appellate counsel was clearly aware of the merits of the *Brady* claim because he raised the same issue in the trial court as to the prosecutor's failure to disclose Rebecca Swanson's 911 call. The absence of Amy Ogilvie's 911 calls so materially affected the outcome of Ogilvie's trial, and appellate counsel's failure to raise the issue constituted ineffective assistance of counsel under *Strickland*.

**D. Trial counsel's and appellate counsel's errors prejudiced the petitioner, and deprived him of a fair trial pursuant to the Sixth Amendment to the United States Constitution.**

As discussed above, trial counsel's and appellate counsel's performances were deficient for multiple reasons.  These errors, explained above, are serious enough that each standing alone constituted deprivation of this right. See *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986) ("a single, serious error may support a claim of ineffective assistance of counsel").  In addition, the cumulative effect of the numerous errors committed by defense counsel deprived petitioner of a fair trial. See *Blackburn v. Foltz*, 828 F.2d 1177, 1186 (6th Cir. 1987) (A habeas case where the court found "Counsel's errors, in combination, effectively deprived [petitioner] of a meaningful defense.")

## RELIEF REQUESTED

The petitioner requests that this court grant his petition for habeas corpus, and the relief requested therein.

__/s/Jennifer J. Qonja_____                    Dated:  March 18, 2016
Jennifer J. Qonja (P 79156)
Frank D. Eaman (P 13070)
Attorneys for Petitioner
Frank D. Eaman PLLC
645 Griswold St., Suite 3060
Detroit, Michigan 48226
(313) 962-7210